## In re RAMADA INNS SECURITIES LITIGATION.

Benjamin DRESNIN, et al., and all others similarly situated, Plaintiffs,

v.

RAMADA INNS, INC., et al., Defendants.

No. 81–456.

United States District Court, D. Delaware.

Nov. 4, 1982.

William Prickett, Elizabeth McGeever, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Law Offices of Arthur N. Abbey, New York City, Berger & Montague, Philadelphia, Pa., Greenfield & Chimicles, Bala Cynwyd, Pa., Kohn, Savett, Marion & Graf, Wolf, Block, Schorr & Solis-Cohen, Ominsky, Joseph & Welsh, Philadelphia, Pa., for plaintiffs.

Rodman Ward, Jr., Stephen P. Lamb, James G. Wiles, Andrew J. Turezyn, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendant Ramada Inns, Inc.

Bruce M. Stargatt, Jack B. Jacobs, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for individual defendants.

## OPINION

STAPLETON, District Judge:

This is a consolidated class action charging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.[1] Plaintiffs have claimed that between January 28, 1979 and August 17, 1981, inclusive (the "class period"), defendants by means of material omissions and misrepresentations fraudulently inflated the price of the common stock of Ramada Inns, Inc. ("Ramada") which ultimately caused loss to the plaintiffs. The putative class members are shareholders of Ramada who purchased shares of the company during the class period. In addition to Ramada, the defendants are the current and three past members of the board of directors and two senior officers of the company.

Ramada is the second largest international operator and franchisor of motor hotels. Its stock is publicly owned with over 27 million shares outstanding. The allegations of the complaint center around the activities of Ramada in connection with its entry into the gaming-hotel industry in 1978 and 1979. Stated broadly, plaintiffs have charged that defendants fraudulently misrepresented and failed to disclose (1) the true status of the construction of the 531–room Ramada Tropicana Hotel and Casino in Atlantic City, New Jersey (the "Tropicana-Atlantic City") which was experiencing numerous changes of plans, construction difficulties and cost overruns, and (2) certain facts in connection with the purchase and status of the 1,150-room Tropicana Hotel and Country Club in Las Vegas, Nevada (the "Tropicana-Las Vegas") which was allegedly purchased without proper investigation and subsequently mismanaged. This fraud is alleged to have caused an artificial inflation of the price of Ramada stock during the period when the members of the plaintiff class were purchasing their stock.

The case is currently before the Court on defendants' motion to dismiss. Defendants argue that plaintiffs have failed (1) to al-

---

1. Plaintiffs also brought derivative claims under Delaware law which have been voluntarily dismissed without prejudice by agreement of the parties.

**1130**

lege reliance on the misrepresentations or omissions complained of, (2) to adequately investigate to ensure that there are good grounds for the complaint as required by Fed.R.Civ.P. 11, and (3) to satisfy the requirement of Fed.R.Civ.P. 9(b) that fraud be pleaded with particularity. They also urge that certain of plaintiffs' allegations are simply charges of failure to disclose mismanagement or errors in business judgment on the part of Ramada's management which do not amount to actionable violations of the federal securities laws.

## I. RELIANCE.

■ Defendants correctly point out that the claims asserted in the complaint are not based upon allegations that defendants have engaged in conduct constituting a fraudulent scheme. There is no fraud alleged in the way defendants have been *conducting* Ramada's business; rather, the claim is that defendants have been guilty of material misrepresentations and omissions in *reporting* on Ramada's affairs. Even if reliance is not a necessary element of a Rule 10b–5 claim in other contexts,[2] where, as here, defendants are alleged to have made material misrepresentations and/or omissions and plaintiffs are alleged to have incurred a loss through voluntary purchase and sale decisions, it is the Third Circuit view that reliance on defendants' actions is a necessary element of a Rule 10b–5 claim. *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

■ If plaintiffs in this case have satisfied the reliance requirement, it is by their allegation that:

Each of the foregoing material facts, which was either intentionally misrepre-

sented or not disclosed, artificially inflated the market prices of Ramada's common stock during the Class Period. In ignorance of the falsity and inflated nature of the market prices of Ramada's common stock and relying upon the integrity of the marketplace, plaintiffs and the members of the Class purchased Ramada's common stock and were damaged thereby. Had plaintiffs and the members of the Class known of the true financial and operating condition of Ramada, they would not have purchased its common stock at the artificially inflated prices they did and sustain damage thereby. (Complaint ¶ 28).[3] Since this case is before me on a motion to dismiss, if plaintiffs can prove any set of facts in support of the allegations of the complaint which would entitle them to relief, the motion cannot be granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While I am not altogether clear what is intended by plaintiffs' "reliance" allegation, I am unable to say that plaintiffs can prove no set of facts in support of this allegation which would permit recovery.

The function of the requirement of reliance in a case of this character is to demonstrate a causal connection between defendants' conduct and the investment decision of the plaintiff occasioning his or her economic loss. One way of demonstrating this "transaction causation"[4] is to show the plaintiff's personal exposure to the offending statements of management, together with conduct by plaintiff (for example, the purchase of stock) which would not have occurred but for this exposure to management's statements. Since plaintiffs here have clearly made a conscious decision not to allege reliance through their personal

---

**2.** *See,* for example, *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), where defendants engaged in a comprehensive scheme to defraud which included substantial collateral conduct in addition to misrepresentations and omissions in a proxy solicitation.

**3.** References throughout to the Complaint are to the Consolidated Complaint, Docket No. 5.

**4.** The Second and Ninth Circuits have described this requirement as "transaction causation", as contrasted with "loss causation". *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

exposure to defendants' statements, if this were the only way to satisfy the requirement of reliance, it would be proper to grant defendants' motion. The options open to plaintiffs in this position are not so limited, however; longer chains of causation may suffice.

■ For example, a plaintiff may show that he or she purchased in reliance upon the recommendation of an investment advisor whose advice was in turn based on management's misreporting of corporate affairs. *See, Walsh v. Butcher & Sherrerd,* 452 F.Supp. 80 (E.D.Pa.1978). A plaintiff may also allege reliance "on the integrity of the market" and prove a *prima facie* case of reliance by showing (a) the existence of an active, national market, (b) the issuance by management of material statements which are misleading because of misrepresentations or omissions, (c) a favorable report in the *Wall Street Journal* which would, in all likelihood, not have appeared had management disclosed the true state of the corporation's affairs, and (d) a purchase in reliance on that report. The Second Circuit in *Panzirer v. Wolf,* [5] found that such evidence would support an inference of transaction causation which would shift to defendants the burden of going forward with evidence of nonreliance (and perhaps, shift the burden of persuasion as well). As the Court there observed:

> Though, at trial, the validity of the chain of causation will be tested, on summary judgment questions about this chain of causation must be resolved in favor of plaintiff, who in the case of a material fraud on the market enjoys a presumption of reliance. Where the plaintiff acts upon information from those working in

or reporting on the securities markets, and where that information is circulated after a material misrepresentation or omission, plaintiff has stated a sufficient claim of reliance on the misrepresentation or omission.

663 F.2d 365, 367.[6]

■ While I do not here adopt all that has been said in the name of the fraud-on-the-market theory, I can conceive that the plaintiffs in this case may be able to introduce sufficient evidence of (a) a causal connection between management's misleading information and the stock price and (b) reliance by the plaintiffs on the pricing of stock in the market to permit an inference that management's misconduct was responsible for the plaintiffs' unfortunate investment decision. For example, if plaintiffs were to show that their investment decision was based upon an analysis of recent price trends, causation might be established. In such a case, the defendants would, of course, be entitled to introduce evidence tending to refute any link in the chain of causation. But the availability of such evidence is irrelevant at this stage in the absence of an admission by the plaintiffs that their purchase was not a proximate result of defendants' alleged misconduct. Plaintiffs have not made such a concession, however, and they have made affirmative allegations which make it premature to pass on the reliance issue without further information regarding the role played by market information and pricing in plaintiffs' investment decision.

## II. FEDERAL RULES OF CIVIL PROCEDURE 9(b) AND 11.

■ Rule 9(b) provides:

---

**5.** 663 F.2d 365 (2d Cir.1981), *cert. granted, Price Waterhouse v. Panzirer,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 and *cert. denied, Panzirer v. Wolf,* —— U.S. ——, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982).

**6.** *Panzirer* is one of several cases whose holding comes under the rubric of the "fraud-on-the-market" theory. The basic supposition of the theory is that where there is a large, impersonal, actively traded market, investment decisions typically are not made on the basis of the investor's own analysis of management's state-

ments. Rather, investors may base their decisions on the reports of others who have read the statements, as in *Panzirer,* or, going one step further, because of the expectation that such markets are "efficient," investors may rely on the market price itself to reflect all the available information. *See, In re LTV Securities Litigation,* 88 F.R.D. 134 (N.D.Tex.1980). For a thorough discussion of the fraud-on-the-market theory see, Note, *"The Fraud-on-the-Market Theory,"* 95 Harv.L.Rev. 1142 (March 1982).

*Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

This rule is applicable to securities actions brought under Section 10(b) and Rule 10b–5. *Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 272 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Temple v. Haft*, 73 F.R.D. 49, 52 (D.Del.1976). Rule 11 provides that the signature of the attorney who signs a pleading "constitutes a certificate by him ... that to the best of his knowledge, information, and belief there is good cause to support it." The purpose of Rule 11 is "to place a moral obligation upon the attorney to satisfy himself that there are good grounds for the action." 5 Wright & Miller, *Federal Practice and Procedure*, § 1333 (1971).

The combined effect of Rules 9(b) and 11 is that an attorney before commencing any action involving fraud or mistake must have more specific information reasonably believed to be trustworthy than would be required if she were commencing any other kind of action. By so requiring, these rules seek "to assure that a complaint is being filed to redress a wrong which is reasonably believed to have occurred rather than as a mere pretext for discovery [in search] of unknown wrongs." *Temple v. Haft*, 73 F.R.D. 49, 52 (D.Del.1976). Once a securities case progresses beyond the pleading stage and into discovery, a very substantial investment of resources is ordinarily required before an evaluation of the merit of the plaintiff's case can be made. This fact has led courts in recent years to be more sensitive in their application of Rules 9(b) and 11 to the potential for abuse of the litigation process in such cases. This has been particularly true in what some courts have referred to as "fraud-by-hindsight" cases. *See, Denny v. Barber*, 576 F.2d 465 (2d Cir.1978); *Goldman v. Singer*, 89 F.R.D. 436 (S.D.N.Y.1981); *McFarland v. Memorex*, 493 F.Supp. 631 (N.D.Cal.1980).

In the typical "fraud-by-hindsight" case, the defendant company has experienced some business misfortune which is ultimately reported in its own periodic reports to stockholders and in the financial press. The publication of this information produces a drop in the market price of the company's stock and many unhappy stockholders. The suit which follows normally alleges that information concerning the impending misfortune or its root causes was omitted from earlier management publications despite the fact that management then knew the information. The omitted material is frequently contrasted with optimistic rhetoric from the pre-misfortune period in connection with an assertion that the earlier publications were false and misleading.

Such situations may develop as a result of negligence on the part of management or as a result of unforeseeable events beyond management's control. If so, they do not implicate the interests protected by the securities acts. On the other hand, such situations may reflect a deliberate decision of management to cover up facts likely to depress the market in the company's stock. In that case, they may involve violations of the federal securities acts. If there is any reasonable basis for believing a case may fall into the latter category, discovery should be permitted and the case should go forward; otherwise it should not.

If, for example, the information available to the plaintiff is so limited that he or she cannot express with particularity the communication involved, the material facts misrepresented or omitted, and why the communication was misleading, Rule 9(b) requires that the case not proceed further unless and until the plaintiff acquires further information and amends the complaint. *See, Denny v. Barber*, 576 F.2d 465 (2d Cir.1978). Where the plaintiff does allege such matters with particularity and alleges the requisite state of mind or *scienter* of the defendants in general terms as permitted by Rule 9(b), nevertheless, further proceedings are precluded by Rule 11 if the

only information available to plaintiff and his or her attorney provides no reasonable basis for inferring the existence of the alleged *scienter*. *See, Goldman v. Singer,* 89 F.R.D. 436 (S.D.N.Y.1981).

Many of the allegations of the complaint pertaining to the construction of the Tropicana-Atlantic City are in the nature of "fraud-by-hindsight". Specifically, plaintiffs allege:

The defendants repeatedly misrepresented the construction costs of the Tropicana-Atlantic City, despite the fact that they knew such statements were false or had no basis for making an accurate estimate. Defendants misled investors by estimating the final construction cost on various dates as follows:

August 23, October 4, 1979—$135 million; February 15, February 27, 1980—$155 million; April 3, 1981—$235 million; 1980 Annual Report—$251 million; May 14, 1981, July 21, 1981—$281 million.

(Complaint ¶ 27(j)). It is further alleged that the casino complex was not completed until late 1981 at a cost of $330 million. In related allegations, plaintiffs claim that the defendants failed to disclose that the ultimate cost of the casino would be such that (a) Ramada could not meet its then existing budget for the complex, and, indeed, could not operate it profitably in the foreseeable future (Complaint ¶¶ 27(k) and (q)), (b) the book value of the complex should be written down to reflect likely losses from the operations (Complaint ¶ 27(1)), (c) other reported accounting information should be written down or written off (Complaint ¶ 27(m)), and (d) the $110 million credit arrangement represented in February 1980 to be sufficient to cover the construction would in fact be insufficient (Complaint ¶ 27(q)).

Plaintiffs allege with considerable particularity the communications which they challenge, the material facts allegedly misrepresented or omitted, and the basis for maintaining that the communications were misleading. With respect to defendants' state of mind, plaintiffs allege that the defendants knew at the time of each publication either that their cost estimate was "false" (i.e. materially less than their then current estimate) or that the "completion cost could not be reasonably projected." (Complaint ¶¶ 27(q) and (j)). These allegations comply with the standard of Rule 9(b).

With respect to Rule 11, while defendants acknowledge that the cost of the complex was far in excess of management's prior estimates, they maintain that the sources from which plaintiffs' information has come provide no basis for inferring any wrongful state of mind on the part of the defendants at the time they made each estimate. Although the Court has been presented with an appendix containing numerous corporate reports and articles from the Wall Street Journal, neither plaintiffs' brief nor their oral argument attempted to identify the information contained therein which they believe support an inference of wrongful intent at the relevant times.[7] This failure

**7.** When the Court raised this issue through questioning at oral argument, counsel referred primarily to information plaintiffs hoped to produce in discovery:

THE COURT: But are the Wall Street Journal and your clients, are they saying the same thing? The Wall Street Journal reports that there has been increasing cost to build the Atlantic City casino because of regulatory delays and union foot-dragging.

MR. WOLFE: Right.

THE COURT: You say that this delay was a delay that was known about in advance and was withheld with the intent to mislead the market.

MR. WOLFE: Assuming that is true, that would be the basis of our allegation. Now, we either prove that or we don't, that they had a study done a year and a half ago which said, in light of the union situation and in light of the nature of construction costs, we are never going to meet our budget, but we'll release it as it gradually rises in level every couple of months. Well, I would say to you that if they knew that back then but they have the trickle-out theory as opposed to the trickle-down theory, that that would be a fraud, that if they knew—

THE COURT: But that is not what they are arguing. Maybe that would be a fraud, but does the Wall Street Journal article provide you any basis for suggesting that there was a fraud?

MR. WOLFE: Well, I think that if they are going to stand on their word that they are a company that engaged in long-term careful

is not explainable on the ground that the basis for the inference is obvious.

It is true, as plaintiffs urge, that the threshold of Rule 11 is not a high one; a plaintiff cannot be required to establish the merits of the case at the time of its filing. It is further true that decisions under Rule 11 in securities cases must be made with the realization that *scienter* can only be inferred from circumstantial evidence, much of which ordinarily will not be available to the stockholder. Nevertheless, Rule 11 would be stripped of any meaning if plaintiffs in situations like this were not required to articulate some rational basis for a belief that the defendants deliberately misled the market. This is particularly true where, as here, many of the defendants are outside directors and where none of the defendants is alleged to have profited personally from the alleged frauds through insider trading or otherwise.[8]

I am not prepared to say that counsel cannot marshal sufficient circumstantial evidence from the mass of material submitted to satisfy Rule 11 and justify discovery with respect to the "fraud-by-hindsight" allegations. I am prepared to say, however, that counsel have not done so and that they should be required to do so on a defendant-by-defendant basis before discovery proceeds.

Not all allegations of the complaint fall within the "fraud-by-hindsight" mold. There are allegations which refer not to failures to foresee events, but rather to facts which, had they been true at the time of the challenged communication, would in all likelihood have been known to those involved in running the business. Plaintiffs

allege, for example, that defendants failed to disclose that, (a) as a part of the agreement to purchase the Tropicana-Las Vegas it was agreed that the former owners would have operational control of casino operations (Complaint ¶ 27(c)), (b) the Tropicana-Las Vegas was plagued by employee theft which cost the company approximately $30 million over a period of less than eighteen months (Complaint ¶ 27(d)), and (c) Ramada had abnormally large amounts of uncollectable gaming markers outstanding (Complaint ¶¶ 27(e), (f)).

Defendants contend that these allegations are simply a repetition of charges reported in various *Wall Street Journal* articles and that these articles cannot be a sufficient basis for supporting the complaint under Rule 11. They stress that while the articles make these allegations, they also contain denials by Ramada, as well as by others, as to many of those allegations. Under such circumstances, defendants suggest, plaintiffs were under a duty to investigate those allegations further before filing the complaint.

The Third Circuit Court of Appeals has held that reliance on a *Wall Street Journal* article satisfies the similar verification requirement of Rule 23.1.[9] In the course of so holding, the Court observed:

> Reliance on an article in the Wall Street Journal is not reliance on an insubstantial or meaningless investigation. Plaintiffs and their attorneys need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal.

financial planning and careful analysis of the gaming market, then I think we have the right as plaintiffs in a 10b–5 case at this stage to rely and make the connection between what they say they did, what we think they really know, and what the Wall Street Journal revealed that actually had happened—in other words, that the price had gone up to the extent that it did. We can make that connection.

**8.** One of the defendant directors, Richard Snell, does not even appear to have been connected with management at all throughout most of the

class period. He did not become a director until March 1981, over two years after the start of the class period.

**9.** Rule 23.1 provides that in a shareholder derivative action, "the complaint shall be verified." The purpose behind Rule 23.1 is to ensure that there are good grounds for a complaint so as to discourage strike suits by individuals trying to coerce corporate managers into settling worthless claims in order to be rid of them. *Lewis v. Curtis,* 671 F.2d 779, 787 (3d Cir.1982).

*Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir. 1982).

■ The fact that the *Journal* also published self-serving denials of these allegations by Ramada and others does not, in and of itself, mean that there are not good grounds for the complaint and that plaintiffs needed to conduct a further investigation in order to satisfy Rule 11. Those self-serving denials did not cause the *Journal* to retract the earlier statements. Thus, plaintiffs' attorneys, even if relying solely on information from the *Wall Street Journal* to support this category of claims, have satisfied their obligation under Rule 11.

## III. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

Defendants urge that certain of plaintiffs' allegations are nothing more than claims that defendants have failed to disclose corporate mismanagement and that, as such, they do not state a claim under Rule 10b–5. *See* the Complaint ¶¶ 27(a), (b), and (g). Defendants' argument rests primarily on the holding in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In the *Santa Fe* case, the Supreme Court addressed the relationship of Section 10(b) to claims of corporate mismanagement or breach of fiduciary duty. The Court held that such claims, unaccompanied by a claim of deception, misrepresentation, manipulation, or nondisclosure, failed to state a cause of action under Section 10(b). Further, in Part IV of that opinion, the Court indicated that "corporate conduct traditionally left to state regulation" was beyond the reach of federal securities law. It did not delineate, however, the reach of Rule 10b–5 where the state regulated conduct is accomplished, aided, or concealed by communication with shareholders invoking misrepresentations or omissions. *See, Merritt v. Colonial Foods, Inc.,* 499 F.Supp. 910, 913 (D.Del.1980).

The Third Circuit Court of Appeals has since given this further elucidation. In *Biesenbach v. Guenther,* 588 F.2d 400 (3d Cir.1978), plaintiffs claimed that defendants' statements characterizing certain transactions as being in the best interests of the shareholders were false and misleading in violation of Section 10(b) and Rule 10b–5. The Court held that the nondisclosure of directors' motives for a transaction in and of itself is not sufficient to constitute a violation of the Act. "The unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external." *Biesenbach* at 402.

■ But, the nondisclosure of material facts underlying a breach of fiduciary duty, as opposed to the disclosure of the motives for defendants' actions or a characterization of those facts as a breach, does violate Section 10(b). *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641 (3d Cir. 1980). In *Healey,* a minority shareholder argued that if he had been given the information he had requested about the specifics of a merger proposal, he would have tried to enjoin the merger in state court. The Third Circuit held that plaintiff's cause of action under Rule 10b–5 was not barred by *Santa Fe.*

What was objectionable in Santa Fe was use of rule 10b–5 by the federal courts to override traditional areas of state law "[a]bsent a clear indication of congressional intent." 430 U.S. at 479, 97 S.Ct. at 1304. Thus the problem in Santa Fe was not merely federal judicial intrusion into areas of state law, but rather federal judicial invasion of areas of state law without explicit federal statutory authority.

Here, by contrast, the plaintiff alleges that the defendants engaged in conduct expressly forbidden by the statute and the rule: an omission of certain information claimed to be material. That the harm to the plaintiff from the omission was deprivation of a state remedy in no sense diminishes the federal interest in preventing the omission and thereby ensuring full disclosure of all material information in securities transactions.

616 F.2d at 646.

■ I think it fair to say that the allegations challenged here by the defendants involve more than claims that the defendants

have failed to disclose motives or to characterize management conduct as a breach of duty. Accordingly, while I have considerable question as to whether the alleged omissions will prove to be material in light of what was disclosed, I conclude that these claims are not dismissable for failure to state a claim.

## IV. CONCLUSION.

Defendants' motions under Rules 12(b)(6) and 9(b) will be denied. Plaintiffs will be permitted a further opportunity to demonstrate compliance with Rule 11 before a final decision is made on defendants' motion under that rule.