**Steven GOLDMAN, Plaintiff,**

v.

**The SINGER COMPANY, Joseph B. Flavin, William F. Schmied and Joseph E. Smith, Defendants.**

**No. 80 Civ. 1514 (WK).**

United States District Court, S. D. New York.

Feb. 26, 1981.

Milberg, Weiss, Bershad & Specthrie by Richard M. Meyer and Robert P. Sugarman, New York City, for plaintiff.

Winthrop, Stimson, Putnam & Roberts by Steven A. Weiner and Susan S. Egan, New York City, for defendants.

### MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Defendants, three directors of the Singer Company and the company itself, move to dismiss the amended complaint in this 10b–5 class action[1] on the ground that it

---

1. As is customary, the complaint charges defendants with violating Sections 10(b) and 20 of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j and 78t (as well as Rule 10b–5

fails to specify, as required by Federal Rule of Civil Procedure 9(b), the "circumstances constituting" the fraud and deceit with which defendants are charged. As plaintiff is represented by a highly competent—and indeed outstanding—law firm, this motion does not concern itself with the niceties of pleading. For present purposes, we may assume that the amended complaint now before us is a model of clarity and precision. The stark question presented is: Are the facts alleged in the complaint—and otherwise known to plaintiff—sufficient to justify plaintiff's invocation of the powers of the federal judiciary to compel the defendants to account for all of their corporate activities over the past several years? Plaintiffs in class actions have frequently been referred to as private attorneys general. We may therefore restate the essential question as follows: Has this particular private attorney general come forward with facts sufficient to establish probable cause justifying the issuance of a judicial search warrant? For reasons that follow, we conclude that he has not.

### FACTS

*Background Facts Generally Known to the Public*

The Singer Company, an international concern of great prestige and fame, had in the first half of the last decade come upon hard times. Its difficulties seemed to fall into three categories: (a) its management had gone hog-wild in a diversification program which had resulted in a wide variety of ill-digested and unprofitable acquisitions; (b) its primary product line, the renowned Singer sewing machine, while still profitable, was being manufactured principally at two plants in Clydebank, Scotland and Elizabeth, New Jersey, each of which was about 100 years old and therefore hard-pressed to meet the competition of new plants springing up throughout the world;[2] and (c) the Singer sewing machine was facing a shrinking domestic market because of the circumstance that American women, who had been among its principal customers, were progressively devoting less time to sewing.

Late in 1975 the Singer board of directors secured the services of the defendant Joseph Flavin (who had established a reputation for excellence as, successively, comptroller of I.B.M. World Trade Corp. and executive vice-president of Xerox), and had given him the responsibility of "turning the company around" and making it once more profitable. Flavin advised the stockholders that, as he and his co-defendant directors analyzed the situation, the first priority was to rid the company—at a considerable balance sheet loss—of the unprofitable ventures that were draining its financial resources. That accomplished, they would be free to tackle the modernization of the sewing machine operations. Their periodic reports to the stockholders expressed confidence in their ability to achieve their objective of making Singer once more profitable.

The 1977 annual report (released on March 10, 1978) spoke of the company's successes in ridding itself of unprofitable enterprises, and noted that its products manufactured for the consumer (i. e., sewing machines) continued to show "dramatic growth." It further noted that the company was doing research into "the reasons why women sew and why they don't sew", and concluded that there existed "an excellent opportunity to develop and launch a full-scale nationwide program to expand the market in sewing."

The first quarterly 1978 report (released on May 5, 1978) opened with an enthusiastic announcement of a dramatic rise in earnings. The second quarterly report for that year (released on August 14, 1978) noted a

---

promulgated thereunder), and with committing common law fraud.

**2.** The complaint does not specifically admit that the age of these plants was generally known to the public, but we may take judicial notice that the existence and general condition of Singer's century-old plants in Clydebank and Elizabeth could hardly have been closely guarded secrets.

"rebound of consumer sewing" in the company's major European markets, "continued strength" in the developing world, and a prospect of improvement in both areas. The third quarterly report (released on November 9, 1978) continued the optimism. It annexed highlights from a speech by James J. Johnson, executive vice president, in which he had expressed the belief that it would be possible to reverse negative trends in the company's sewing machine market.

The 1978 annual report (released on March 8, 1979) spoke of a "new plan for Clydebank" which would reduce the "labor force by almost half" and would "ultimately result in Clydebank again becoming a cost-effective operation."

On or about October 12, 1979, however, the company announced that it had been forced to close its plant in Clydebank and that it was establishing a $130,000,000 reserve to be charged against income for the third quarter of 1979—causing the company to sustain a net loss for that quarter—to cover the costs of restructuring Singer's sewing machine operations in Europe and North America. This announcement caused a decline in the price of Singer's securities, and it is plaintiff's claim that he and his class (persons who purchased such securities between March 10, 1978 and October 12, 1979) were damaged by defendants' fraudulent or reckless failure to make an earlier announcement of the need to close the plant and establish the $130,000,000 reserve.

*Facts Upon Which Plaintiff Seeks to Predicate His Charges of Recklessness or Fraud*

Plaintiff does not contend that any fact stated in any of Singer's reports was inaccurate. He does not dispute the existence of a dramatic rise in earnings or of the other favorable facts referred to in those reports. He simply contends that the reports were materially false in failing to make timely forecasts of future difficulties. Aside from the circumstance that only seven months elapsed between the last optimistic report and the October 12 announce-

ment, the only facts upon which plaintiff relies to establish fraud or recklessness are those to be gleaned from two magazine articles published, respectively, in the November 5, 1979 *Fortune* and the March 13, 1980 *Business Week*. These articles, written by investigative reporters based largely on interviews with past and present Singer officers and employees, seek to probe the seriousness of Singer's undoubted financial woes. The titles of the articles aptly characterize their content. The *Fortune* article is captioned "Behind The Snafu At Singer," with the sub-caption, "When Joseph Flavin came in to rescue the venerable company four years ago, the sewing-machine business was the least of his worries. Not anymore." The *Business Week* title asks: "Is Singer Heading for Self Liquidation?"

The articles describe defendant Flavin's advent to the company and his high hopes—based in part on his own past successes—of bringing this "venerable industrial giant swimming in red ink" back into profitable operation. They show how he, in company with "most outsiders" and apparently "Singer insiders as well", was convinced that the Singer sewing machine business, although beset with difficulties, was essentially sound and that the solution to the company's principal problems lay in getting rid of the myriad of unprofitable enterprises with which it had been saddled by previous management.[3] With respect to the sewing machine business itself, the difficulties at Clydebank—obsolete equipment and an obdurate union—seem to have been typical, and the *Fortune* article describes defendant Flavin's high hopes of "and some progress towards" solving these problems. It then notes that these hopes turned out to be illusory and recounts how—on the day before the October 12 press release—defendant Flavin had flown to Glasgow to meet with a delegation of Scottish trade unionists and give them the "very bad news" that the Clydebank plant would be closing at a cost of 3,000 jobs.

Aside from analyzing the causes of the "Snafu" both articles—especially the one in

---

**3.** As defendant Flavin is clearly the prime mover at Singer, we adopt the convention followed by both *Fortune* and *Business Week*, and per-

sonalize the events at Singer by describing them in terms of defendant Flavin's activities.

*Business Week*—try to assess the chances of the company's future success. One of defendant Flavin's strong points appears to be his ability to maintain the confidence of the nation's leading banks and bankers. One of his "most difficult" problems, *Business Week* observes, may be "[r]eassuring the company's employees."

Although, as already noted, the articles are in part based on interviews with former officers and employees—by hypothesis a very critical group—neither article attributes to defendant Flavin any deceit, recklessness or wrongdoing. The most critical things that appear to be said of him are that he was not sufficiently skeptical of optimistic reports from veteran Singer officers and employees, and that he did not succeed quickly enough in revamping the lines of communication in this moribund company. Bad news therefore did not get to him in time.

One of the matters mentioned in the *Fortune* article was that defendant Flavin had "belatedly" commissioned an economist, Norma Pace, to "get at why the market was in such a disturbing decline." Her ensuing report, according to *Fortune*, "pointed out the obvious" fact that young women in America weren't sewing as much as their mothers had, and that by 1985 this trend would probably be more pronounced.

## DISCUSSION

One of the primary purposes of Rule 9(b), particularly in the context of securities litigation, is to prevent persons from being subjected to the full panoply of discovery sanctions on the basis of unsubstantiated charges of fraud. *Ross v. A. H. Robbins* (2d Cir. 1979) 607 F.2d 545, 557. This doctrine was first promulgated in this Circuit by Judge Friendly speaking for the Court in *Denny v. Barber* (2d Cir. 1978) 576 F.2d 465. There, adopting language that the Supreme Court had used in a slightly different context, he observed (at 470):

"[T]o the extent that such discovery 'permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.' "

In deciding the *Denny* case in the District Court, Judge Lasker had dramatized the need for protecting corporate directors from speculative 10b–5 litigation. *Denny v. Barber* (S.D.N.Y.1977) 73 F.R.D. 6. Faced with the necessity of periodic reports to their stockholders, directors are at peril whether their predictions are optimistic or pessimistic. Dismissing a complaint that sought to impose liability upon directors for failing to forewarn the public of impending disaster, Judge Lasker observed (at 9, n.2):

"If defendants had described the vague contingencies limned in [the complaint] and reality had provided a happier turn of events, would not defendants have been liable for their gloomy publications?"

The facts in the instant case suggest a danger not mentioned in Judge Lasker's opinion. Had defendants indeed foreseen the 1979 disasters and disclosed their fears in their 1977 annual report, it is quite possible that they would now be faced with a derivative action. An ingenious stockholder, supported by an imposing array of experts, might well be contending that the company had been fundamentally sound and would have weathered the economic storms of the past several years but for defendants' reckless prophecies of doom which had undermined the employee confidence so essential—as was indicated by *Business Week*—to success.

In light of the foregoing principles, it cannot seriously be argued that plaintiff has come forward with facts sufficient to justify a judicial investigation of Flavin and his co-defendants.[4] *Denny* conclusively establishes—for this Circuit at least—that the mere occurrence of unpredicted disaster is an insufficient basis on which to predicate a charge of recklessness or fraud against a

---

4. The situation is quite different from the one that confronted the Court in *Credit & Finance*

*Corp. v. Warner & Swasey Company* (2d Cir. 1981) 638 F.2d 563. There Judge Friendly was

corporate director. Nor is there anything in either or both of the magazine articles to support such a charge. Certainly defendants cannot be faulted for not advising their stockholders of Ms. Pace's hardly astounding observation that young women in America were spending progressively less time at the sewing machine.[5]

It follows that the action must be dismissed. As we have assumed the amended complaint to be a model of clarity and precision, and as plaintiff does not suggest an ability—absent the judicial search warrant which is being denied him—to come forward with any new or different facts, there would be no purpose in allowing time for further pleading. The amended complaint is accordingly dismissed without leave to replead.

SO ORDERED.

able to isolate a discrete issue that could be resolved by "modest discovery" which the district court was instructed to keep under a "tight reign." Here, by contrast, the attempt would be to establish when the defendants first knew—and appreciated the significance of— the complex constellation of circumstances responsible for the "Snafu at Singer." Nothing that any of them ever did, thought, saw or heard while at Singer could fairly be said to be irrelevant to such an inquiry.

**5.** It is ludicrous to attempt—as plaintiff does— to equate the Pace report with the one considered in *Ross v. A. H. Robbins, supra*, which gave warning of possible fatal consequences in the use of the Dalkon Shield.