**Gilberte N. CRYSTAL, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**Lewis Wilson FOY, Bernard D. Broeker, Albert M. Reed, C. Thompson Stott, Frederick W. West, Jr., C. William Ritterhoff, Richard M. Smith, Charles W. Ganzel, and Bethlehem Steel Corporation, Defendants.**

No. 80 Civ. 446.

United States District Court, S.D. New York.

April 26, 1983.

Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Richard D. Greenfield, Greenfield & Chimicles, Bala Cynwyd, Pa., Allen D. Black, Fine, Kaplan & Black, Philadelphia, Pa., for plaintiff.

J.R. Hupper, Cravath, Swaine & Moore, New York City, C.H. Barnette, General Counsel, Bethlehem Steel Corp., Bethlehem, Pa., Edwin P. Rome, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for defendants.

EDWARD WEINFELD, District Judge.

Plaintiff, an attorney with securities law experience, purchased 150 shares of Bethlehem Steel Corporation ("Bethlehem") on July 28, 1977, one day after it announced a reduction in its quarterly dividend from fifty cents to twenty-five cents. On August 18, 1977, following a disastrous flood at its Johnstown, Pennsylvania plant and other adverse factors, Bethlehem announced a plan to improve its profitability, a principal element of which was a 2.6 million ton reduction of its steelmaking capacity at its Johnstown and Lackawanna, New York plants.

In January 1980, almost two and a half years after her purchase, plaintiff commenced this action individually and on behalf of all persons who purchased Bethlehem shares between January 27, 1977, the day after Bethlehem issued its preliminary earnings report for 1976, through August 18, 1977 ("class period"), the day on which Bethlehem made its announcement with respect to the Johnstown and Lackawanna plants.[1] Her principal charges centered about matters with respect to these plants, although other charges were included. The complaint alleged that during the class period the defendants, Bethlehem and its chief and seven other executive officers and directors, conspiratorially engaged in fraudulent and manipulative conduct in violation of section 10(b) of the Securities Exchange

1. The class has not been certified.

Act of 1934 ("Act")[2] and Rule 10b–5 promulgated thereunder ("Rule")[3] and of principles of state and common law; that said conduct caused members of the class to purchase Bethlehem common stock "for grossly excessive consideration," and had the effect of artificially supporting or maintaining the market price of Bethlehem's common stock.

Plaintiff's original complaint was dismissed by Judge Pierce,[4] who found it "deficient," inter alia, insofar as it failed "to set forth with sufficient particularity the source of the facts upon which plaintiff's information and belief is based." In granting leave to serve an amended complaint, Judge Pierce cautioned that "the sources of the information and belief should be sufficiently identified so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein."[5] Following service of her amended complaint, the defendants again moved to dismiss, whereupon plaintiff cross-moved for leave to serve a second amended complaint, which motion was granted. Upon the service of plaintiff's second amended complaint, the defendants now move to dismiss with prejudice pursuant to Rule 9(b) of the Federal Rules of Civil Procedure on the ground that it fails to allege fraud with particularity, and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

Preliminary, it is desirable to refer to the underlying reasons for the particularity requirement of Rule 9(b). These have been recognized in numerous rulings by our Court of Appeals: to prevent irreparable damage to defendants' reputation and good will that results from unwarranted charges of fraud; to minimize potential strike suits which by the abuse of time-consuming and expensive pretrial discovery with its disruption of normal business activities serve as an *in terrorem* force to augment the settlement value of such actions; to prevent the engagement of the facilities and services of the Court with respect to such groundless claims; and to assure that a defendant accused of fraudulent conduct is given particularized information to enable him to respond adequately.[6] Also, in the consideration of the instant motion it is desirable to bear in mind that the Act and the Rule were designed to protect the investing public "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive.' "[7]

Our Court of Appeals, in a recent decision, has reiterated its "insist[ence] that a complaint alleging fraudulent violations of Section 10(b) and Rule 10b–5 satisfy the particularity requirement of Fed.R.Civ.P. 9(b).[8] To pass muster in this Circuit a complaint 'must allege with some specificity the acts constituting the fraud';[9] conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough.[10]" The Court further admonished: "To state a claim under section 10(b), plaintiff

2. 15 U.S.C. § 78j(b).

3. 17 C.F.R. § 240.10b–5.

4. The case originally was assigned to Judge Pierce. Upon his appointment to the Court of Appeals, it was reassigned to this Court.

5. *Crystal v. Foy,* CCH Fed.Sec.L.Rep. ¶ 98,204 at 91,429 (S.D.N.Y.1981).

6. *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Segal v. Gordon,* 467 F.2d 602 (2d Cir.1972). *See also Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975).

7. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977).

8. *Citing Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–59 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978); *Segal v. Gordon,* 467 F.2d 602, 606–08 (2d Cir. 1972).

9. *Citing Rodman v. Grant Foundation,* 608 F.2d 64, 73 (2d Cir.1979).

10. *Citing Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972).

must allege facts indicating an intent to deceive, manipulate, or defraud,[11] and Rule 9(b) requires that the circumstances constituting such fraud be stated with particularity."[12] Thus, to satisfy the rule, plaintiff's complaint must allege (1) specific facts; (2) sources that support the alleged specific facts; and (3) a basis from which an inference of fraud may fairly be drawn.

Against that background of applicable law we turn to the amended pleading. Stripped to its essentials, the discursive and somewhat free-wheeling complaint charges that plaintiff and members of her class were fraudulently induced during the class period to purchase shares of Bethlehem stock at excessive prices by the defendants' conspiratorial and fraudulent concealment and failure to disclose that:

(1) it was *certain* that Bethlehem would have to close down its unprofitable Johnstown steelmaking plant in 1978 and *likely* that the Lackawanna facilities would be closed in the near future and that as a consequence several hundreds of millions of dollars of plant closing costs would be incurred;

(2) Bethlehem had overstated its earnings and assets because it had failed to write down the value of these facilities to their net realizable value and to provide a reserve for several hundreds of millions of dollars that would be incurred for such plant closings;

(3) for many years Bethlehem failed adequately to fund its various pension plans and failed to disclose the extent of underfunded and unfunded liabilities and the invalidity of various actuarial assumptions that were utilized;

(4) Bethlehem's reliance upon debt to finance its operations and the inadequacy of its cash flow for "badly needed" modernization plans, particularly with respect to the obsolete steelmaking facilities at the Johnstown and Lackawanna plants; and

(5) Bethlehem understated costs and overstated assets by using straight-line depreciation schedules which did not take into consideration the capital intensive nature of Bethlehem's business and the effects of inflation or replacement cost of the underlying assets.

The complaint further alleges that all the foregoing facts were known to or recklessly disregarded by the defendants, and that each defendant was personally aware of all the material facts with respect to Bethlehem's financial and operating condition prior to and throughout the class period. Plaintiff asserts that the misrepresentations were made or omitted from various Bethlehem annual and quarterly corporate reports and SEC filings.[13] In addition to listing Bethlehem's annual and other reports and its press releases as the sources of information with respect to misrepresentations or omitted statements, plaintiff cited a potpourri of almost 100 newspaper and magazine articles about Bethlehem, other steel companies, the steel industry and its problems as a cyclical industry. As to these latter publications, with but one exception referred to hereafter, the complaint makes no specific reference to any portion of the publication. Simply listing a mass of documents does not satisfy Rule 9(b). Plaintiff must "indicate how ... these sources ... provide the requisite factual support for the complaint's accusations ... [and must] link

---

**11.** Citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 n. 7, 96 S.Ct. 1375, 1380 n. 7, 47 L.Ed.2d 668 (1976).

**12.** *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114, 115 (2d Cir.1982).

**13.** Preliminary report for 1976; Form 10–K and annual report for 1976 dated February 9, 1977; reports for third quarter 1976, first quarter 1977, second quarter 1977; Forms 10–Q for second quarter 1976, first and second quarters 1977; and "press releases issued during the class period reflected in the listing of articles contained in paragraph 33 hereof, reported by news publishers as the financial reports of Bethlehem and dividend reports issued in connection with dividends paid during the class period." Second Amended Complaint, ¶ 27.

. . . the sources to subsequent allegations in the pleading." [14]

A fair reading of plaintiff's second amended complaint compels the conclusion that it, too, is deficient and that not only does it not comply with the particularity requirement of Rule 9(b), but even assuming that the sources of her allegations are somewhere to be found in the massive documents listed by her, they provide no basis from which a fair and reasonable inference may be drawn of manipulative and fraudulent conduct attributable to each defendant. Instead of putting herself "on record as to what the alleged fraud consists of specifically," [15] plaintiff has relied upon generalities. Considering all the allegations of her complaint, other than those conclusory ones that the defendants' conduct was fraudulent and each has "manifested a conscious and continuous effort to distort the truth and otherwise mislead the investing public in order artificially to support the market price of Bethlehem stock . . .", they do not sufficiently identify the sources upon which she relies, or allege facts indicating an intent to deceive, manipulate or defraud or from which such intent may reasonably be inferred. It is desirable to consider each of these charges separately.

1. *The Claim with Respect to the Johnstown and Lackawanna Plants.*

Analysis of this claim requires a reference to the sequence of events. Bethlehem is the nation's second largest producer of steel and steel products in the United States, with plants of steel-producing capacity in various locations of the country. Raw steel was produced at its various steelmaking facilities by three methods: (1) open hearth furnaces; (2) basic oxygen furnaces; and (3) electric furnaces. At its Johnstown, Pennsylvania and Lackawanna, New York plants the open hearth method

had been used; some of these facilities had been installed in the 1940's. By the early 1970's this method was somewhat outmoded and uneconomical and in addition subjected Bethlehem to charges by federal and state authorities because of alleged environmental protection problems that resulted from their operation. In fact, such a proceeding had been instituted by the Environmental Protection Agency ("EPA") with respect to the Johnstown plant pursuant to section 113 of the Clean Air Act of 1970. [16] In December 1974, Bethlehem entered into a Consent Order ("the Consent Order") in settlement of the EPA proceeding, under which all the open hearth furnaces were to be eliminated by November 1, 1978 under a specified timetable. Bethlehem's SEC Form 10–K for the 1974 fiscal year, filed in February 1975 and subsequent filings and reports, made no specific reference to the consent decree, an omission upon which plaintiff predicates part of her claim of fraud, discussed hereafter.

On July 20, 1977, the flood struck the Johnstown plant, impairing its productive capacity. [17] Soon thereafter, on August 18, 1977, Bethlehem announced a plan to help improve its profitability, the principal elements of which were a reduction in steelmaking capacity at its Johnstown and Lackawanna plants; a reduction in capital spending for 1977–78 by approximately two hundred million dollars, and a reduction in salaried and hourly work force and overhead to a level consistent with the revised capacity. The announcement noted that the Johnstown plant would be reduced to a steelmaking capacity of 1.2 million tons annually as compared to its pre-flood capacity of approximately 1.8 million tons and that as a result of this reduction and that at Lackawanna there would be an aggregate reduction in corporate steelmaking capacity amounting to 2.6 million tons, or approximately 10% below the level at the begin-

---

**14.** *Decker v. Massey-Ferguson, Ltd.,* 534 F.Supp. 873, 878 (S.D.N.Y.1981), *aff'd in part and rev'd in part,* 681 F.2d 111 (2d Cir.1982).

**15.** *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982) (citations omitted).

**16.** 42 U.S.C. § 7413.

**17.** Other adverse factors, a fire at one of its mines in Pennsylvania and an abnormally harsh winter, also affected Bethlehem's earnings in 1977 which led to the profitability plan.

ning of 1977. Plaintiff designates August 18, 1977, the date of the foregoing announcement, as the end of the class period.

Her principal charge has been that the defendants knew, but had fraudulently failed to disclose and had concealed during the class period from plaintiff and the investing public, that Bethlehem's steelmaking capacity greatly exceeded present and anticipated demand, particularly that by 1976 the Johnstown and Lackawanna steelmaking plants had become increasingly unprofitable; that it was "certain" that the unprofitable Johnstown steelmaking facilities would have to be closed in 1978 and "likely" that the Lackawanna facilities would be closed in the near future, and further that the defendants concealed the financial effects of such closings.[18]

Her claim that it was "certain" that Bethlehem would have to shut down the Johnstown plant by 1978 rests in part upon the provision in the Consent Order requiring the shutdown of all the open hearth furnaces by 1978. The thrust of her argument is that although the defendants knew by 1976 Bethlehem was required to write down the open hearth furnaces and related facilities to their net realizable value and to establish a reserve for closing costs, they failed to do so by that time. The argument proceeds that their failure to disclose the terms of the Consent Order and its consequent financial impact was fraudulent and reckless. But the very document she relies upon negates the charge of fraudulent concealment. The EPA Consent Order did not require a "shut down" or "closing" of the Johnstown plant; it did require a shut down of the existing "open hearth furnaces." The decree provided for their elimination under a timetable: (a) three by December 31, 1975 and (b) the remaining five by November 1, 1978. During the phase-out period Bethlehem continued to operate the open hearth furnaces under an adjusted schedule. The open hearth furnaces were to be replaced by a new two-vessel basic oxygen steelmaking complex, which new facility was expected to be in operation in 1978. The replacement was part of a modernization program which Bethlehem had announced in May 1974, eight months before the Consent Order was entered into in December 1974. The modernization program is referred to in the decree, to wit: "... the basic oxygen furnaces that will replace the open hearth shop ...."[19] It was specifically mentioned in Bethlehem's SEC Form 10–K for the 1974 fiscal year, as follows:

> In May [1974] Bethlehem revised its earlier decision announced in 1973 to reduce the annual capacity of the Johnstown plant from 2,300,000 tons to about 1,000,000 tons and Bethlehem now plans to maintain that plant's capacity and employment at about current levels. A new two-vessel basic oxygen steel-making complex which will replace the present open hearth furnaces was authorized in December [1974] and is scheduled to be placed in operation during 1978.

Plaintiff's own source repels her claim that it was "certain" the Johnstown steelmaking facilities would have to be closed in 1978. To the contrary, the prospect was that there would be a new viable unit capable of efficient operation by 1978. Indeed, steps were taken to implement the modernization program. On August 22, 1975, a Bethlehem press release[20] announced that Bethlehem had awarded a contract for the purchase of two basic oxygen furnaces and their components and that while the purchase was a major aspect of the overall project, other contracts were yet to be let, including one

---

**18.** Second Amended Complaint, ¶¶ 15, 17.

**19.** Consent Order, p. 2, ¶ 4.

**20.** As noted earlier, plaintiff listed press releases as among her sources. Thus it is entirely appropriate for the Court to review these press releases "to determine, at the pleading stage, whether an inference of fraud may fairly be drawn from the information contained therein." *Crystal v. Foy,* C.C.H.Fed.Sec.L.Rep. ¶ 98,204 at 91,429 (S.D.N.Y.1981). *See also Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 113 (2d Cir.1982) ("Because ... plaintiff's allegations ... center upon Massey's 1975 Annual Report which is in the record, we may properly refer to its contents.")

for the construction of a cleaning system and the erection of a building to house the basic oxygen furnace complex.

Thereafter, on February 15, 1977, Bethlehem announced the first phase of the steel erection for the basic oxygen furnace complex at the Johnstown plant which involved the positioning of the main support column for the furnace aisle of the basic oxygen facility, to contain two 185-ton vessels and scheduled for completion in late October. On July 20, 1977, the flood occurred at the Johnstown plant.[21] Thus there is no support from the sources relied upon for the claim that material information as to the Consent Order was withheld from the shareholders. As already noted, the modernization program, whereby the existing open hearth furnaces were to be replaced by a new basic oxygen steelmaking complex which was scheduled for operation during 1978, was announced eight months before the Consent Order was entered into. Under all the circumstances, there was no reason for the various reports to which plaintiff refers to specify the terms of the consent decree which provided for the gradual elimination of the open hearth furnaces which were to be replaced by the basic oxygen furnaces under the modernization plan. Whether eliminated under the modernization plan or under compulsion of the Consent Order, there was no concealment of a material fact. The facts were disclosed. The failure to specify the terms of the Consent Order by itself does not permit an inference of fraudulent conduct by defendants.[22]

Plaintiff contends that even if her claim is not upheld with respect to the nondisclosure of the terms and effect of the Consent Order, nonetheless the defendants engaged in other fraudulent and manipulative conduct. These are based upon her allegations, already referred to, that by 1976, to the knowledge of the defendants, the steelmaking facilities at both the Johnstown and Lackawanna plants had "been increasingly unprofitable for several years, with the possible exception of 1974, and had no prospect for profitable operation in the future,"[23] thus making it "certain" that the former would be closed in 1978 and "likely" that the latter would be closed in the near future. Accordingly, she also charges as to both plants that the defendants fraudulently overstated Bethlehem's assets and understated its liabilities by failing to write down the unprofitable facilities at both plants and to establish a reserve against closing costs by 1976. Other than to allege this charge of fraudulent conduct, plaintiff has

---

**21.** Following the August 18, 1977 announcement of the capacity reduction at Johnstown, the open hearth furnaces remained in operation until 1981, when an electric furnace shop rather than a basic oxygen complex went into operation. *See* Plaintiff's and Defendant's Local Rule 3(g) Statements and Plaintiff's Reply Memorandum at 7 submitted in connection with plaintiff's motion for partial summary judgment.

**22.** Plaintiff makes a separate but related claim based upon this Consent Order. She contends that the defendants committed fraud in failing "to correct the statement [in its 1974 Form 10–K] that Bethlehem had decided not to reduce the 2.3 million ton capacity of its Johnstown plant, when that capacity had been reduced to 1.8 million tons by the end of 1976 and would be further reduced by the closings mandated by the Consent Order." Second Amended Complaint, ¶ 27(e). As discussed above, however, plaintiff's own source—the Consent Order itself—does not mandate a reduction of the Johnstown steelmaking capacity but rather contemplates the elimination and replacement of open hearth furnaces with basic oxygen furnaces, which replacement would maintain the Johnstown capacity at 2.3 million tons as set forth in Bethlehem's 1974 Form 10–K in the portion quoted above. Thus there was no need to correct the statement during the class period because, according to the very source cited by plaintiff, it remained true. The fact that the capacity had been reduced to 1.8 million by the end of 1976 reflected the closing of three open hearth furnaces in accordance with the timetable of the consent order. This reduction was not a permanent reduction mandated by the consent order, as alleged by plaintiff, but rather part and parcel of the modernization plan which, when completed, it was contemplated would maintain the 1974 capacity of 2.3 million tons. Thus, during the class period until the August 18, 1977 announcement, the statement announced in 1974 was not misleading but an accurate reflection of defendants' plans, according to plaintiff's own sources.

**23.** Second Amended Complaint, ¶ 14.

set forth no single fact from which a reasonable inference may be drawn that a write down should have been made by 1976, as alleged in her complaint, or the latest by the "end of 1976," as stated in her memorandum.[24] Plaintiff has failed to supply some factual sources upon which she bases her charge that each defendant, prior to the August 1977 announcement, knew or became aware that the plants in question were no longer economically viable and that the write down should have been made by 1976 and a reserve set up for closing costs.[25] She does not state what date or approximate date is encompassed by the vague phrase "likely in the near future." She has alleged no facts as to the actual carrying value of the facilities or what she claims the write down and other closing costs should have been for each plant. The general allegation that the assets were overvalued and liabilities understated without specification is inadequate. Our Court of Appeals addressed such an allegation in *Decker v. Massey-Ferguson, Ltd.:*

> Plaintiff also alleges that Massey did not write down the value of certain functionally and economically obsolete manufacturing facilities, "including" three that plaintiff deigned to name. Plaintiff did not allege the figures at which any of the facilities were carried on Massey's books nor even the approximate figures at which they should have been carried.... The complaint contains no factual allegations to demonstrate the materiality of the alleged overevaluation in the light of these overall figures.[26]

The gist of her charges centers about the assertion that both facilities "had no prospect of profitable operation" by 1976 or at the latest by the end of 1976; in short, that

the defendants should have acted much sooner than they did. Whether there was a prospect for their profitable operation after 1976 represents not "a concrete fact, but rather ... a conclusion."[27] This was a matter of judgment based upon a consideration of complex matters involving Bethlehem, the steel industry and domestic and international economies.

The steel industry is a cyclical industry, subject to a variety of factors, many beyond its control, such as the economic vitality of the construction and automobile industries, labor and material costs, competition from foreign steel and governmental policies with respect to imports and pollution controls, to mention but a few. Whether and when a particular unit or facility of a giant and farflung industrial enterprise should be discontinued or written down brings into play the vagaries of these factors which may vary from time to time dependent upon the state of domestic and international economies as to which economists themselves are so often in disagreement. It may well be that under given circumstances the failure to take action by a fixed time may constitute negligent conduct, but negligence is not actionable under the Act and Rule.[28] What plaintiff's allegations amount to is "fraud by hindsight,"[29] which does not state a section 10(b) claim. What plaintiff has done here is to comb the corporate reports and public documents to challenge the conduct of Bethlehem's affairs by its executives, and contends they should have made and disclosed their decision by 1976, two years after it had experienced profitable years of earnings, instead of August 1977. It may fairly be said here, as it was in another instance, "plaintiff's complaint is

---

24. *See* Plaintiff's Memorandum in Opposition at 8. *See also Goldman v. Singer Co.,* 89 F.R.D. 436, 439 (S.D.N.Y.1981).

25. *See Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981).

26. 681 F.2d 111, 116 (2d Cir.1982) (citations omitted).

27. *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768–69 (S.D.N.Y.1981).

28. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

29. *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978). *See also Credit & Finance Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981); *Goldman v. Singer Co.,* 89 F.R.D. 436, 439 (S.D.N.Y.1981).

in large measure an indictment of the management of a company, which like the industry in which it operates has fallen on hard times." [30] Section 10(b) and Rule 10b–5 were not designed "to regulate transactions which constitute no more than internal corporate mismanagement." [31]

### 2. Pension Claim.

With respect to Bethlehem's pension liabilities, plaintiff charges that for many years Bethlehem had failed adequately to fund its pension plans and that by 1976 its accrued pension plan liability was in excess of two billion dollars. Bethlehem's 1976 annual report stated that as of December 1976 the actuarially computed value of vested benefits exceeded the market value of the pension trust fund at that date by approximately $1,284 million. Plaintiff alleges that this disclosed amount was

> materially understated in that [it was] ... based upon actuarial assumptions which were wholly unjustified given the nature and circumstances of Bethlehem's business and specifically in light of the impending closing of major facilities. Particularly, the "wage-rate" and "interest" assumptions upon which the pension liabilities were based were inconsistent with the actual and likely returns on Bethlehem's invested pension fund assets and the prospective growth of wages of covered employees.[32]

However, plaintiff does not state in what respect the actual assumptions were "wholly unjustified"; she provides no specifics as to the alleged inconsistencies; she does not particularize what Bethlehem's "actuarial," "wage rates" and "interest" assumptions were, what they should have been, the financial impact of the differences between the actual and correct assumptions, the actual or likely returns on Bethlehem's invested pension fund assets and the prospective growth of wages of covered employees. In *Decker v. Massey-Ferguson, Ltd.,* the Court affirmed the dismissal of a similarly vaguely stated pension claim, holding:

> Despite a comprehensive discussion of Massey's pension plans in the footnotes of its consolidated financial statements, plaintiff alleges fraudulent concealment, undescribed inconsistencies in actuarial assumptions, and understatement of pension expenses "in an amount not yet determined." The information in the financial statements complied with then-existing SEC regulations, and plaintiff has alleged no particulars of fraudulent concealment.[33]

Unlike the plaintiff in *Decker,* plaintiff here has alleged a particular amount by which the actual liabilities exceeded the disclosed liabilities, but it is an arbitrary figure without factual support. She attempts to supply this deficiency by seizing upon a $483 million one-time charge to 1977 income, incurred as a result of terminating employees in connection with the "profitability plan" announced on August 18, 1977, which involved a reduction in salaried and hourly work force affecting some 7300 personnel. In its 1977 annual report, Bethlehem stated that "approximately $483 million represents the estimate of the present value of pension costs and the costs of other benefits payable to terminated and laid-off employees." Plaintiff, by *ipse dixit,* argues that this "enormous charge for pension costs provides ample evidence to support plaintiff's claim that Bethlehem's pension expense has been understated." [34] But not a single fact is alleged to provide "ample evidence." To the contrary, the 1977 annual report makes clear that the $483 million charge involved not only pension expenses, but other benefits payable to the terminated employees, such as continued life and

---

**30.** *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982).

**31.** *Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). *See also Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir. 1972).

**32.** Second Amended Complaint, ¶ 16.

**33.** 681 F.2d 111, 116 (2d Cir.1982).

**34.** Plaintiff's Memorandum in Opposition at 15.

other insurance, and supplemental unemployment benefits. The termination of a work force of more than 7000 employees obviously involved substantial liability for the pension and other employee benefit obligations. The report states that the cost of those benefits "was recognized in 1977 ... even though payment of most of the benefits will extend over a lengthy period of time." The one-time $483 million charge representing an estimate of the present value of pension and other benefits payable to the terminated employees does not permit as a fair inference, to use plaintiff's language, that "Bethlehem's unfunded or underfunded pension liabilities at the year end 1976 were not" $1,284 million, as disclosed by Bethlehem in its 1976 annual report, "but in fact, were in excess of $2,000 billion." [35]

In short, plaintiff's pension claim fails to comply with Rule 9(b) because it provides no specifics about the alleged improper and inconsistent actuarial assumptions and because her allegations give no factual support to the claim that unfunded pension liabilities exceeded the amount actually disclosed.

### 3. Indebtedness Claim.

Plaintiff claims that "defendants failed adequately to disclose the extent to which ... Bethlehem was relying on debt to finance its operations and that its cash flow was inadequate for badly needed modernization plans." [36] Once again, a comment from the decision in *Decker v. Massey-Ferguson, Ltd.* is instructive as to why this claim fails to comply with Rule 9(b):

> Despite figures in Massey's financial statements which accurately portrayed the nature and extent of Massey's indebtedness, the Company, according to plaintiff, should have informed the world that it had overextended itself financially and that there was "substantial undercapitalization and excessive debt financing ...." Massey's capitalization and debt structure were fully disclosed in its consolidated financial reports. [37]

The conclusory allegation that defendants concealed the extent to which they were relying on debt and the inadequacy of the cash flow, without citation to sources which either support plaintiff's information or belief or permit a reasonable inference of fraud, does not pass muster under Rule 9(b).

### 4. Depreciation Claim.

Plaintiff's claim that defendants overstated Bethlehem's earnings, assets, book value and shareholders' equity by using straight-line depreciation schedules which did not take into account the capital intensive nature of Bethlehem's business and the effects of inflation is another conclusory allegation unsupported by a single fact. The complaint does not set forth from which sources plaintiff derived her information and belief that Bethlehem used depreciation schedules in a way which resulted in overstatements in its financial reports. Moreover, the law is clear that the mere

---

**35.** Second Amended Complaint, ¶ 27(d). To support her position, plaintiff relies upon an August 1977 Blyth Eastman Dillon report on Bethlehem which "concludes that the charge to income for pension costs resulting from the plant closings should have been $83 million, if Bethlehem had not understated its pension liabilities and expenses." Plaintiff's Memorandum in Opposition at 15. Passing for the moment whether this hearsay statement made by a third party without firsthand knowledge of Bethlehem's books is of any probative value, the statement does not appear in the report. The report states only that an analyst thought that an "estimated $83 million [would] be charged off for pension costs." Not only does plaintiff miscite this particular source, but also (if outside analyst hearsay statements are competent evidence) defendants point out that she has ignored another "estimate" *contained among her own sources* of what the pension costs of terminated employees would be, which approximates the amount actually charged off by Bethlehem in 1977. A *Wall Street Journal* article dated August 19, 1977, the day after the announcement of the capacity reductions, reports an estimate by a securities analyst that "pension costs alone for the 7,300 workers who will be laid off could total 'more than $400 million.'"

**36.** Second Amended Complaint, ¶ 27(c).

**37.** 681 F.2d 111, 116 (2d Cir.1982).

fact that a financial report contains overstatements does not *ipso facto* give rise to an inference of impropriety.[38] Since plaintiff only asserts in conclusory fashion that the defendants created overstatements in Bethlehem's financial reports through improper use of straight-line depreciation without pleading facts that indicate that defendants did so with an intent to manipulate or deceive, this claim, too, fails under Rule 9(b).

As stated in *Skubik v. Leeds:*

While plaintiffs allege that defendants permitted Manhattan to adopt and utilize *inadequate* accounting records and controls ... this merely suggests negligence and does not set forth a "factual basis for believing" that defendants "acted fraudulently." [39]

5. *Allegations as to the Individual Defendants' Motive and Involvement.*

The only specific identification in the complaint of the many news articles cited by plaintiff as a source of information relates to Lewis Wilson Foy, who at the time alleged was Bethlehem's chief executive officer. This is a statement attributed to him which appeared in the January 1976 issue of Fortune Magazine that: "I always tell our people the most precious thing we have is our 'AA' rating." That statement may readily be accepted as fact. The maintenance of the AA rating by rating agencies is dependent upon a specified debt to equity ratio. Bethlehem lost its AA rating when it announced the reduction in its steelmaking capacity in August 1977. Plaintiff alleges that although not required to plead motive for the defendants' alleged fraudulent conduct, nonetheless she has so pleaded.[40] She

contends that the defendants knew of the possibility of the reduction in steelmaking capacity at the Johnstown and Lackawanna plants by 1976, long before the actual announcement of August 1977, but withheld the information until that time to "mislead the investing public in order artificially to support and maintain the market price of Bethlehem stock and to cover up their own conduct and its consequences to Bethlehem and to maintain Bethlehem's AA bond rating and to maintain the value of Bethlehem's executives' stock and stock options positions ...." [41] In view of this Court's holding that plaintiff has failed to specify facts upon which a fair inference of fraudulent conduct may be drawn, the alleged motive, assuming its validity, is irrelevant.

Finally, with respect to the general allegations regarding the individual defendants' involvement in the alleged fraudulent scheme—for example, that each defendant was "personally aware of all material facts with respect to Bethlehem's financial and operating conditions ... which facts were not disclosed or misrepresented ...," such broadside allegations fail to furnish the required factual predicate for allegations of fraud and deception. Our Court of Appeals has condemned such allegations "as so broad and conclusory as to be meaningless." [42]

6. *Conclusion.*

The plethora of allegations with their iterated charges of fraud does not obscure the fact that plaintiff has failed to comply with the requirements of Rule 9(b). Detailed analysis of the varied allegations of the complaint and a close study of the massive material relied upon to satisfy the re-

---

**38.** *See Skubik v. Leeds,* CCH Fed.Sec.L.Rep. ¶ 97,986 at 91,069 (S.D.N.Y.1981).

**39.** *Id.*

**40.** In view of the disposition on this issue, the Court does not pass upon the plaintiff's contention that she is not required to plead motive with specificity for the defendants' alleged fraudulent conduct, which defendants dispute where dismissal of the complaint is sought for failure to comply with Rule 9(b). They rely upon such cases as *Gross v. Diversified Mort-*

*gage Investors,* 431 F.Supp. 1080, 1088 (S.D.N.Y.1977), *aff'd,* 636 F.2d 1201 (2d Cir.1980) ("Plaintiff must plead what defendant obtained as a consequence of the fraud."); *see also Fidenas A.G. v. Honeywell, Inc.,* 501 F.Supp. 1029, 1039 (S.D.N.Y.1980).

**41.** Second Amended Complaint, ¶ 30.

**42.** *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982).

quirements of Rule 9(b) justify the comment that this is another instance of where a plaintiff is not seeking to "redress ... a wrong," but rather "to find one."[43] The plaintiff raises the usual plea that the details and specifics of the fraudulent conduct charged against the defendants are within the peculiar knowledge of each and contained within the files and records of Bethlehem, and thus she urges she should be permitted pretrial discovery. But "[t]he discovery rules are not a hunting license to conjure up a claim that does not exist."[44] The plaintiff has been afforded two opportunities to amend her initial complaint. This is her third attempt to state a viable claim. Judge Pierce, in dismissing plaintiff's initial complaint, put her "on the plainest notice of what was required."[45] Having had three opportunities to show that she has a basis for the serious charges made against the defendants of defrauding the investing public by fraudulent and manipulative conduct, and having failed to meet the requirements of Rule 9(b), plaintiff is not entitled to a fourth go-around. To grant leave to serve a fourth pleading would frustrate the salutary purposes of the Rule.

The action is dismissed with prejudice.[46]

So ordered.

---

**43.** *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972).

**44.** *Samuels v. Eleonora Beheer, B.V.,* 500 F.Supp. 1357, 1362 (S.D.N.Y.1980), *aff'd,* 661 F.2d 910 (2d Cir.1981).

**45.** *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir. 1978). *See also Skubik v. Leeds,* CCH Fed.Sec. L.Rep. ¶ 97,986 (S.D.N.Y.1981); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765 (S.D.N.Y.1981);

*Goldman v. Singer Co.,* 89 F.R.D. 436 (S.D.N.Y. 1981).

**46.** The state and common law claims are dismissed since the Court's jurisdiction over these claims is based on principles of pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).